UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------X

UNITED STATES OF AMERICA,

v.

JAMEL SMITH,

Defendant.

---------------------------------------------------------------X

**DECISION AND ORDER**
20-CR-239 (BMC)

**WILLIAM F. KUNTZ, II, United States District Judge:**

Before the Court is the Government's letter appealing Magistrate Judge Peggy Kuo's order granting Jamel Smith ("Defendant") bond pending resolution of his violations of supervised release. Aug. 19, 2026 Letter Appealing Magistrate's Bail Order (the "Gov't Letter" or "Government's Letter"), ECF No. 2629.[1] Defendant opposes the Government's appeal. Def.'s Response in Opp'n ("Def.'s Opp'n" or "Defendant's Opposition"), ECF No. 2633. For the following reasons, the Government's Letter request is **GRANTED** and Defendant is **REMANDED** into custody; Defendant's Motion for Leave to File a Document in Response to the Government's Appeal of the Bail Determination ("Def.'s Letter"), ECF No. 2630, is **DENIED** as moot.

## BACKGROUND

### I. Procedural History

The Court assumes familiarity with the instant case and only states the facts relevant to the issues pending before the Court.

On February 17, 2021, a U.S. Grand Jury returned a then-sealed twenty-nine count indictment (the "Indictment") against forty-nine individuals. Indictment, ECF No. 292. Defendant was charged in Counts Eight and Nine of the Indictment, both of which included criminal forfeiture allegations. *Id.* ¶¶ 35–36, 59–60, 63–64. Count Eight alleged conspiracy to distribute and possess with intent to distribute controlled substances in violation of 21 U.S.C. §§

[1] Citations are to the docket in *United States v. Smith*, 20-CR-239. Page pincites refer to the ECF page numbers assigned to a filing, where available, and where no ECF heading is present, to the page numbers listed in the original filing.

846 and 841(b)(1)(C), *id.* ¶ 35; and Count Nine alleged money laundering conspiracy in violation of 18 U.S.C. § 1956(h), *id.* ¶ 36.

On March 9, 2021, then-Chief Magistrate Judge Cheryl L. Pollak arraigned Defendant on the Indictment. ECF No. 379. Defendant pled not guilty to both counts. *Id.* Chief Magistrate Judge Pollak ordered Defendant detained without prejudice to present a bail application. *Id.*

On October 18, 2021, and upon Defendant's consent, Defendant pled guilty to Count Eight of the Indictment before then-Magistrate Judge Roanne L. Mann. ECF Nos. 568–69.

On August 15, 2023, District Judge Brian M. Cogan sentenced Defendant to fifty-one months' incarceration—to run consecutively to any sentence imposed in Defendant's pending state case—to be followed by three years of supervised release with two special conditions. Aug. 15, 2023 Min. Entry. Count Nine was dismissed upon motion by the Government. *Id.*

On May 7, 2025, the U.S. Probation Office ("Probation") filed a violation of supervised release report (the "First VOSR") asserting four charges ("Charges One through Four") against Defendant consisting of three charges for new criminal conduct and one charge for possession of a firearm. First VOSR at 5–6, ECF No. 2191.

On June 10, 2025, Magistrate Judge Joseph A. Marutollo arraigned Defendant on the First VOSR. ECF No. 2239. Defendant pled not guilty to Charges One through Four. *Id.* The same day, Magistrate Judge Marutollo denied Defendant's bond application with leave to present a "better package" and ordered Defendant detained pending adjudication of the VOSR charges. ECF Nos. 2239–40.

On June 12, 2025, Chief Magistrate Judge Vera M. Scanlon held a hearing and ordered Defendant released on a $100,000.00 bond with four sureties. ECF Nos. 2245–46.

On July 28, 2025, Probation filed a supplemental violation of supervised release report (the "Second VOSR") asserting three new charges ("Charges Five through Seven") against Defendant consisting of three charges for new criminal conduct. *See* Second VOSR at 2.

On August 11, 2025, Magistrate Judge James R. Cho arraigned Defendant on the Second VOSR. ECF No. 2317. Defendant pled not guilty to Charges Five through Seven. *Id.* The same day, Magistrate Judge Cho continued Defendant's release on bond. *Id.*

On July 29, 2026, Probation filed a second supplemental violation of supervised release report (the "Third VOSR") asserting six new charges against Defendant split between an incident on June 19, 2026 ("Charge Eight") and an incident on July 16, 2026 ("Charges Nine through Thirteen"). Third VOSR at 2–4. Charges Eight and Nine through Thirteen consisted of six instances of new criminal conduct involving assault and harassment. *Id.*

On August 7, 2026, Probation filed a third supplemental violation of supervised release report (the "Fourth VOSR") asserting six new charges against Defendant ("Charges Fourteen through Nineteen") consisting of five charges for new criminal conduct and one charge of leaving the district without permission. Fourth VOSR at 2–4.

On August 10, 2026, the Clerk of Court issued a summons for Defendant to appear in Court regarding the Third and Fourth VOSR. ECF No. 2620.

On August 12, 2026, Magistrate Judge Peggy Kuo arraigned Defendant on the Third and Fourth VOSR. ECF No. 2621. Defendant pled not guilty to Charges Eight through Nineteen. *See* ECF No. 2622. The same day, Magistrate Judge Kuo granted Defendant's bond application and ordered Defendant released on the previously imposed conditions of release—which included home confinement and electronic monitoring—and added a condition including "evaluation and treatment for mental health problems[,]" and anger management. ECF Nos.

2621–22. At the arraignment, Magistrate Judge Kuo confirmed with two of Defendant's prior four suretors that they agreed to continue acting as suretors, including with respect to the newly imposed mental health and anger management conditions. Tr. at 26–27, ECF No. 2629-1. Magistrate Judge Kuo also instructed defense counsel to inform the remaining two suretors about the additional bond conditions imposed. *Id.* at 27:9–11.

On August 19, 2026, the Government filed its appeal of Magistrate Judge Kuo's bond determination. *See generally* Gov't Motion. The same day, defense counsel filed a letter requesting an opportunity to respond in writing, noting they would be unable to do so before August 24, 2026. *See* Def.'s Letter at 1.

However, on August 20, 2026, defense counsel filed Defendant's Opposition to the Government's Letter. *See generally* Def.'s Opp'n.

The same day, the Court held a hearing on the Government's Letter. *See* Aug. 20, 2026 Min. Entry. At the hearing, defense counsel informed the Court the remaining two suretors were informed of the additional conditions of Defendant's bond and consented to continuing as suretors.[2] *See* Ex. A, Court Real Time Tr. ("RT Tr.") at 18:24–21:7.

## II. Factual Background

### A. Defendant's Underlying Criminal Conduct

In 2020 and 2021, while Defendant was in state custody, he facilitated the sale of synthetic cannabinoids—also known as K2—on Rikers Island. Def.'s Presentence Investigation Report (the "PSR") ¶ 12; Gov't Letter at 3. Defendant's drug dealing was part of a larger drug trafficking conspiracy organized by the Bully Gang, a violent street gang based in the Bedford-Stuyvesant neighborhood of Brooklyn. PSR ¶ 1; Gov't Letter at 3. Gang associates smuggled

[2] The Government clarified Defendant's domestic partner is not one of his suretors, contrary to representations made in the Government's Letter. RT Tr. at 18:24–19:3; *see also* Gov't Letter at 9.

drugs into Rikers Island through various means, including: (a) mailing K2-soaked papers to inmates; (b) having friends and family personally deliver K2-soaked papers to inmates; (c) and bribing corrupt guards to smuggle K2-soaked papers into the jail. Gov't Letter at 3. Within Rikers Island, conspirators sold the K2-soaked papers for "significant profits." *Id.*

Defendant's role in the conspiracy consisted of coordinating and receiving delivery of K2-soaked papers. *See id.* Specifically, Defendant arranged for the papers to be mailed to him at Rikers Island. *Id.* On other occasions—including during a state court appearance—Defendant used his stepfather and mother to facilitate his receipt of drug-soaked papers. PSR ¶ 10; Gov't Letter at 3.

This conduct formed the basis for Defendant's underlying conviction in this case.

**B. Defendant's Alleged Violations of Supervised Release**

Probation has alleged nineteen different charges against Defendant for violating the conditions of his supervised release. *See* First VOSR at 5–6; Second VOSR at 2; Third VOSR at 2–4; Fourth VOSR at 2–4.

Charges One through Four relate to Defendant's arrest for possession of a firearm in March 2025. First VOSR at 5–6; Gov't Letter at 4. New York City Police Department officers found a loaded firearm in Defendant's vehicle along with hundreds of checks believed to be counterfeit. Gov't Letter at 4; *see also* First VOSR at 6. A state court case was filed against Defendant for gun possession, which remains pending.[3] *Id.*

Charges Five through Seven relate to a June 2025 arrest for reckless driving and fleeing from the police. Second VOSR at 2–3; Gov't Letter at 4. Specifically, Defendant fled from police after they attempted to stop Defendant for a traffic infraction. Second VOSR at

[3] According to the Government, Defendant's next court date for the state court case is scheduled for September 16, 2026. Gov't Letter at 4.

3. Defendant drove erratically "at a high rate of speed . . . going through multiple red lights and driving in the wrong direction on a one-way street." *Id.* at 3. Although state charges were filed, they were subsequently dismissed. Gov't Letter at 4 n. 3.

Charge Eight stems from a June 2026 assault arrest after Defendant allegedly punched his domestic partner multiple times over the course of four hours. Third VOSR at 2–3; *see* Gov't Letter at 4–5. An underlying state case was subsequently dismissed after Defendant's domestic partner declined to go forward with the prosecution.[4] Third VOSR at 2–3.

Charges Nine through Thirteen relate to an arrest in July 2026 for a separate alleged assault committed by Defendant. *Id.* at 3–4; Gov't Letter at 4. Defendant allegedly punched and spit on a friend of his domestic partner. Third VOSR at 4–5. The victim sustained a laceration to their arm and substantial pain to their face. *Id.* at 5. An underlying state case related to Charges Nine through Thirteen is pending. Gov't Letter at 5.

Charges Fourteen through Nineteen relate to an alleged bank fraud and counterfeiting scheme conducted in Rhode Island. Fourth VOSR at 4–6; *see* Gov't Letter at 4. In April 2025, Rhode Island authorities began investigating Defendant for cashing a fraudulent check. Fourth VOSR at 4–6. The investigation revealed the car used in connection with a fraudulent check-cashing attempt was registered in Defendant's name. *Id.* at 5. After locating Defendant in his car—along with two other individuals—law enforcement found fake checks, bank cards in different individuals' names, blank paper believed to be used for creating checks, and a portable printer believed to be used for printing checks in Defendant's vehicle. *Id.*; Gov't Letter at 5. Law enforcement also found substantial amounts of cash during the search of Defendant and

---

[4] The domestic partner referenced in Charge Eight is not the same domestic partner Defendant allegedly strangled in 2017. *See* PSR ¶ 42.

his vehicle. Gov't Letter at 5. It was subsequently determined that Defendant's vehicle identification number "had been altered and the car had been reported as stolen in New Jersey."[5] *Id.* Defendant has been charged in Rhode Island with five counts, including bank fraud, manufacturing a counterfeit device, and possessing a stolen car. *Id.*

### C. Defendant's Criminal History

Besides Defendant's conviction in the instant case, he has four prior criminal convictions. PSR ¶¶ 33–36.

In 2014, Defendant participated in an armed robbery during which he used a gun to threaten and hit a victim while his co-conspirator choked the victim. *Id.* ¶ 33. During the robbery, Defendant's co-conspirator also punched, kicked, and threw the victim. *Id.* Defendant was sentenced to five years of probation for his conduct during the robbery. *Id.* While on probation, Defendant allegedly strangled his then-girlfriend, *id.* ¶ 42, and failed to complete a domestic violence program and educational/vocational courses to which he was subsequently referred, *id.* ¶ 33. Defendant was subject to multiple protective orders by his then-girlfriend. *Id.* ¶ 33.

In 2015, Defendant committed a second robbery. *Id.* ¶ 34. Defendant met with the robbery victim under the guise of offering to purchase the victim's necklace. *Id.* Instead, Defendant and a co-conspirator stole the necklace. *Id.* In the course of the robbery, Defendant and his co-conspirator placed the victim in a chokehold and repeatedly punched him. *Id.* The victim suffered bruising, swelling and soreness of his face. *Id.* Defendant was sentenced to five years of probation, concurrent to his probationary sentence for the 2014 armed robbery. *Id.*

---

[5] Defendant denies having knowledge of the altered vehicle identification number, stating he purchased the vehicle, registered it in his own name, and had no idea the car was stolen. Tr. at 20:17–21, ECF No. 2629-1.

In 2017, while Defendant was on probation for his two robbery convictions, he was arrested for obtaining property by false pretenses in Rhode Island. *Id.* ¶ 35. While driving away from a Bank of America, law enforcement stopped Defendant's vehicle and found him without a driver's license or identification. *Id.* In addition, law enforcement found Defendant in possession of a substantial amount of cash, while his co-conspirators possessed a credit card skimming device and fake credit cards. *Id.* Defendant was convicted and sentenced to one year of probation in Rhode Island. *Id.*

In 2018, while on probation for his armed robbery convictions, Defendant was charged with conspiracy to commit bank fraud in the Southern District of New York. *Id.* ¶ 36. Defendant and co-conspirators created fake credit cards with the names of their victims and used the cards to obtain money from the victims' accounts. *Id.* Defendant personally obtained over $195,000.00 from 33 separate victims' accounts. *Id.* Defendant fled to North Carolina when his mother told him law enforcement intended to arrest him. *Id.* Defendant was convicted and sentenced to twenty-seven months' incarceration. *Id.*

Separate from the above convictions, Defendant was transferred to state custody to face a state murder charge. Gov't Letter at 2. Although ultimately acquitted of the murder charge,[6] during his time in state custody, Defendant was involved in nine disciplinary incidents at Rikers Island, including a fight with a fellow inmate and possession of weapons. *Id.*; PSR ¶ 36.

[6] The Government made clear it is not relying on this charge in any way in arguing for remanding Defendant into custody. RT Tr. at 26:12–14. Neither does the Court in arriving at its decision in this action.

## DISCUSSION

### I. Legal Standard

When reviewing a magistrate judge's decision to release a defendant on bond or detain them pending adjudication of the charges against them, a district judge must apply a *de novo* standard of review. *See United States v. Kennedy*, 12-CR-863, 2025 WL 296314, at *2 (S.D.N.Y. Jan. 24, 2025) (Torres, J.) (citing *United States v. Leon*, 766 F.2d 77, 80 (2d Cir. 1985)); *United States v. Edwards*, 21-MC-231, 2021 WL 796089, at *1 (E.D.N.Y. Mar. 2, 2021) (Kuntz, J.) (internal citation omitted).

At the post-sentencing stage, the Court is "authoriz[ed] [to detain] a defendant alleged to have violated the terms of his supervised release pending revocation proceedings." *United States v. Fernandez*, 152 F.4th 124, 132 (2d Cir. 2025) (citing 18 U.S.C. § 3143(a)(1)). When a defendant has been charged with violating the conditions of their supervised release, a rebuttable presumption of detention applies. 18 U.S.C. § 3143(a)(1) ("[T]he judicial officer shall order that a person who has been found guilty of an offense and who is awaiting imposition or execution of sentence . . . be detained, unless the judicial officer finds by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released under section 3142(b) or (c)."); Fed R. Crim. P. 32.1(a)(6) (noting 18 U.S.C. § 3143(a)(1) applies to bond determinations for violations of supervised release); *see also Kennedy*, 2025 WL 296314, at *2.

The defendant bears the burden of "establishing by clear and convincing evidence that the person will not flee or pose a danger to any other person or to the community[.]" Fed R. Crim. P. 32.1(a)(6); *see also Kennedy,* 2025 WL 296314, at *2 ("In contrast to ordinary pretrial detention, in which the Government bears the burden to establish the need for detention . . .

[D]efendant bears the burden to establish, by 'clear and convincing evidence' that he 'will not flee or pose a danger to . . . the community." (citing Fed. R. Crim. P. 32.1(a)(6))).[7]

The Court considers the following factors when determining whether the defendant has met their burden: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger to any person or the community posed by the person's release. *See Kennedy,* 2025 WL 296314, at *2 (citing 18 U.S.C. § 3142(g)); *see also Edwards*, 2021 WL 796089, at *1.

## II. Analysis

### A. Nature and Circumstances of the Offense Charged

Defendant's alleged violations of supervised release are undoubtedly serious, cover a wide range of conduct, and so favor detention.

Charges One through Four allege, *inter alia*, Defendant possessed a "loaded semiautomatic 9MM GLOCK 43" notwithstanding he was a convicted felon. First VOSR at 6. As the Second Circuit recognized in *United States v. Dillard*, "[p]ossession of a gun greatly increases one's ability to inflict harm on others and therefore involves some risk of violence." 214 F.3d 88, 93 (2d Cir. 2000).

Separately, Defendant has been charged for reckless conduct stemming from "dr[iving] at a high rate of speed[,] . . . going through multiple red lights and driving in the wrong direction on a one-way street." Second VOSR at 3 (detailing Charges Five through Seven). Moreover, Defendant allegedly committed not just one, but two acts of domestic violence against his

---

[7] Because the Court is not yet determining whether Defendant's term of supervised release should be revoked—but is merely making a preliminary determination as to Defendant's bond pending adjudication of his alleged violations of supervised release—Federal Rule of Criminal Procedure 32.1(b)(2) does not apply.

partner and partner's friend. Third VOSR at 2–5 (detailing Charges Eight through Thirteen). Defendant purportedly punched his domestic partner multiple times over the course of four hours and similarly punched and spat on his domestic partner's friend on a separate occasion. *Id.* The domestic partner's friend suffered at least one laceration and substantial pain. *Id.* at 5. Physical assault of another individual is facially a serious offense, and reckless driving presents a disregard for the safety of pedestrians on the street.

As for Charges Fourteen through Nineteen, the Court agrees with the Government that the bank fraud and counterfeiting scheme Defendant is alleged to have participated in are "serious and sophisticated crime[s]." *See* Gov't Letter at 7; *see, e.g.*, *United States v. Teman*, 19-CR-696, 2019 WL 7041646, at *7 (S.D.N.Y. Dec. 20, 2019) (Engelmayer, J.) ("Bank fraud is undeniably a serious offense.") (internal citations omitted) (speedy trial context). Moreover, the numerous fake checks, bank cards, blank paper, and portable printer found in Defendant's car suggest an intent to commit fraud on several occasions, magnifying the potential of financial harm to intended victims. Gov't Letter at 7 ("The quantity of checks and check-making equipment found on [Defendant] suggests that he intended to commit this crime hundreds of times, and that he was involved in the creation of the fake checks").

In summary, each of the violations of supervised release Defendant has been charged with constitute serious offenses, the details of which involve either actual or threatened physical or financial harm. And while each alleged act is serious on its own, taken together, they cover an especially wide range of wrongful conduct.

### B. Weight of the Evidence

The weight of the evidence against Defendant also favors detention with respect to most of the charges against him. According to the Government, there is video evidence for at least fifteen of the nineteen alleged violations. RT Tr. at 24:19–25:6.

With respect to Charges One through Four, the Government proffers body-worn camera footage capturing Defendant admitting he owned the vehicle where the firearm at issue was found. Gov't Letter at 8. The evidence also includes the physical firearm itself. *Id.*

With respect to Charges Nine through Thirteen, the Government states video surveillance captures the alleged assault. *Id.* at 5, 8.

Charges Fourteen through Nineteen are said to be supported by video footage of Defendant's vehicle being used in the alleged fraud and instruments of fraud recovered from Defendant's vehicle. *Id.*

Although the Government's Letter points to no specific evidence supporting Charge Eight,[8] the weight of the evidence with respect to a substantial number of the other charges is significant and so favors detention.

### C. History and Characteristics of the Defendant

Defendant's history and characteristics support detention. The Court acknowledges the progress Defendant has made while on supervised release, including the financial and emotional support Defendant has provided to his young son and his mother. Def.'s Opp'n at 2 (noting Defendant provides financial support to his son and mother, takes his son back and forth to school, and participates in his son's basketball activities). The Court also considered the

[8] Contrary to Defendant's representation, Def.'s Opp'n at 2, the Government has not explicitly declined to pursue or otherwise conceded it will not pursue Charge Eight, RT Tr. at 28:21–29:3.

testimony of Defendant's employer, Felix Haney, who supports Defendant's release. *See* RT Tr. at 38–43.[9] The Court has also accounted for Defendant's mental and physical conditions, including the mental health counseling Probation has arranged for him and the physical therapy he requires to treat recent injuries. Def.'s Opp'n at 3–4.

However, these considerations are outweighed by Defendant's other history and characteristics. Defendant has five criminal convictions, spanning armed robbery, obtaining property by false pretenses, conspiracy to commit bank fraud, and drug trafficking conspiracy. *See supra* at 4–5, 7–8. Additionally, while previously incarcerated, he was cited for nine disciplinary incidents at Rikers Island. *Id.* Many of these convictions arose from conduct occurring while Defendant was on probation or in custody for other offenses. *See* Gov't Letter at 8.

Defendant also has a history of disregarding legal orders and restrictions. For example, Defendant failed to complete a domestic violence program and education classes as required by Probation. PSR ¶ 33; Gov't Letter at 8. Shockingly, Defendant also utilized a state court appearance to receive illicit drugs used in the drug scheme in this underlying action. Gov't Letter at 3, 8.

Especially troubling is how these violations of supervised release substantially mirror the conduct for which he was convicted in the past, or at least include conduct forming part of his prior convictions. For example, Charges One through Four concern Defendant's possession of a firearm, despite his prior armed robbery conviction. *See supra* at 10. Defendant has also been convicted for conspiracy to commit bank fraud, which resembles Charges Fourteen through

[9] While testifying, Defendant's employer conceded he paid Defendant by check off the books, and when asked if he complied with his obligations under F.I.C.A., Defendant's employer responded with: what is F.I.C.A? *See id.* at 41:16–17, 43:5–9.

Nineteen alleging bank fraud and counterfeiting schemes. *See supra* at 6–7. Finally, Defendant's alleged use of violence with respect to Charges Eight through Thirteen is reminiscent of his violent conduct exhibited while incarcerated.[10] *See supra* at 8.

For these reasons, Defendant's history and characteristics favor detention.

**D. Nature and Seriousness of the Danger to Any Person or the Community**

Defendant poses a serious danger to the physical and financial safety of those close to him and the community at large. He has multiple convictions for violent offenses. *See supra* at 7–8. He has also participated in multiple instances of fraud. *See supra* at 8. Notwithstanding these previous convictions, Defendant is accused of conduct mirroring these past offenses. *See supra* at 13–14. He has purportedly been found in possession of a firearm capable of inflicting grievous harm on others. *See supra* at 10. He also stands accused of beating his domestic partner and other individuals. *See supra* at 6. Separate from these offenses, Defendant allegedly participated in a bank fraud and counterfeiting scheme capable of inflicting significant financial harm on others. *See supra* at 11. This repeated conduct establishes a serious risk of physical and financial injury to others—even including individuals close to Defendant.

The Court cannot say this danger would be mitigated by current or additional conditions of supervised release. Indeed, home location monitoring would not prevent a subsequent assault of Defendant's domestic partner or others in his residence. In fact, one of the alleged assaults took place in a restaurant Defendant did not have permission to be at while subject to location monitoring. RT Tr. at 29:11–16. The Court also doubts the ability of Defendant's mother—one of his suretors—to restrict the danger he poses to others considering she helped him participate in criminal conduct in the past. *See supra* at 5.

[10] Defendant's PSR also indicated Defendant strangled a former girlfriend in 2017. PSR ¶ 42. However, the PSR did not note a conviction for an offense stemming from this conduct.

Thus, the nature and seriousness of the danger Defendant presents to others favors detention.

**E. Defendant's Remaining Arguments**

Finally, the Court wants to address certain arguments Defendant makes in support of affirming his release on bond.

First, Defendant notes "[t]he Government agreed to, and the Court has approved of[,] [his] release upon conditions up until August 12, 2026." Def.'s Opp'n at 1. Defendant argues the "Government[] change[d] i[ts] position" regarding Defendant's bond when it received information about "a verbal dispute between [Defendant] and his intimate partner[]" and his "new misdemeanor assault charges arising out of an argument in a restaurant." *Id.* Defendant effectively argues the Court should put aside the VOSR charges already considered at his prior bond hearing, and find "the new information that we have, which is really just the two most recent incidents . . . don't . . . give rise to a finding that [Defendant] poses a danger to the community given that he is currently on home confinement with location monitoring and he's got four sureties." Tr. at 9:16–21; *see also* RT Tr. at 30:6–19.

The Government, for its part, represents that separate from the domestic violence incidents outlined in Charges Eight through Thirteen, it has only recently learned of the details concerning the Rhode Island investigation tied to Charges Fourteen through Nineteen. *See* Gov't Letter at 6 n.4. The Government argues this new information—along with Charges Eight through Thirteen—changes the equation and now militates in favor of Defendant's detention. The parties especially debated the issue of the Rhode Island investigation at length.[11]

[11] For example, Defendant argued the Government knew or should have known about the details of the investigation because such information was available to Probation or otherwise obtainable, Def.'s Opp'n at 2, as evidenced by the First VOSR including a reference to the Rhode Island investigation, Tr. at 7:17–24. On this point, however, the Court notes Probation's policy—as the Government represented at oral

However, Defendant's argument regarding what the Government knew about the Rhode Island investigation and at what point the Government received this information is misplaced. When considering a magistrate judge's determination of bond, a district court applies a *de novo* standard of review. *Kennedy*, 2025 WL 296314, at *2. Thus, the Court's duty at this stage is to consider the *entire record available* when making a bond determination and not be bound by prior determinations made by a magistrate judge. It does not matter what any previous judge or court has determined. Before this Court is the most up-to-date information regarding all the charges alleged against Defendant—including those outlined in Charges Fourteen through Nineteen (i.e., the Rhode Island investigation); the Court may rely on such information in reaching its independent, *de novo*, decision. As discussed above, taking all the information presented, the Court finds Defendant has failed to demonstrate by clear and convincing evidence that he is not likely to be a danger to the community.

Second, Defendant asks this Court to place substantial weight on the fact the Probation Office for the Southern District of New York takes no position on Defendant's bond. RT Tr. at 32:2–7.[12] However, taking no position on an issue is simply that: taking no position. The Court refuses to infer support for Defendant's release from the mere silence of the Probation Office for the Southern District of New York.

---

argument—of not disclosing details of a pending investigation for fear of threatening the investigation. RT Tr. at 35:9–20.

[12] No probation officer for the Southern District of New York office attended oral argument. *See* RT Tr. 32:2–17. However, the Probation Office for the Eastern District of New York argued Defendant should be remanded into custody. *See id.* at 6–11.

**CONCLUSION**

Given the presumption of detention and Defendant's failure to demonstrate, by clear and convincing evidence, he is not likely to be a danger to the community, the Court GRANTS the Government's Letter request and REMANDS Defendant into custody.

Defendant's Motion for Leave to File a Document in Response to the Government's Appeal of the Bail Determination, ECF No. 2630, is DENIED as moot. The Clerk of Court is respectfully directed to terminate ECF No. 2630.

**SO ORDERED.**

**s/WFK**

HON. WILLIAM F. KUNTZ, II
UNITED STATES DISTRICT JUDGE

Dated: August 26, 2026
Brooklyn, New York